[No. C059133. Third Dist. Jan. 13, 2011.]

GINA M. HOLMES, Plaintiff and Appellant, v.
PETROVICH DEVELOPMENT COMPANY, LLC, et al., Defendants and
Respondents.

1050

---

**COUNSEL**

Law Offices of Joanna R. Mendoza and Joanna R. Mendoza for Plaintiff and Appellant.

Perkins & Associates and Robin K. Perkins for Defendants and Respondents.

## OPINION

**SCOTLAND, J.**[*]—Plaintiff Gina M. Holmes appeals from the judgment entered in favor of defendants Petrovich Development Company, LLC, and Paul Petrovich in her lawsuit for sexual harassment, retaliation, wrongful termination, violation of the right to privacy, and intentional infliction of emotional distress.[1] She contends that the trial court erred in granting defendants' motion for summary adjudication with respect to the causes of action for discrimination, retaliation, and wrongful termination, and that the jury's verdict as to the remaining causes of action must be reversed due to evidentiary and instructional errors. We disagree and shall affirm the judgment.

Among other things, we conclude that e-mails sent by Holmes to her attorney regarding possible legal action against defendants did not constitute " 'confidential communication between client and lawyer' " within the meaning of Evidence Code section 952. This is so because Holmes used a computer of defendant company to send the e-mails even though (1) she had been told of the company's policy that its computers were to be used only for company business and that employees were prohibited from using them to send or receive personal e-mail, (2) she had been warned that the company would monitor its computers for compliance with this company policy and thus might "inspect all files and messages . . . at any time," and (3) she had been explicitly advised that employees using company computers to create or maintain personal information or messages "have no right of privacy with respect to that information or message."

As we will explain, an attorney-client communication "does not lose its privileged character for the sole reason that it is communicated by electronic means or because persons involved in the delivery, facilitation, or storage of electronic communication may have access to the content of the communication." (Evid. Code, § 917, subd. (b).) However, the e-mails sent via company computer under the circumstances of this case were akin to consulting her lawyer in her employer's conference room, in a loud voice, with the door open, so that any reasonable person would expect that their discussion of her complaints about her employer would be overheard by him. By using the company's computer to communicate with her lawyer, knowing the communications violated company computer policy and could be discovered by her employer due to company monitoring of e-mail usage, Holmes did not communicate "in confidence by a means which, so far as the client is aware,

---

[*]Retired Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Hereafter, we will refer to Petrovich Development Company, LLC, as the company, to Paul Petrovich as Petrovich, and to them collectively as defendants.

discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted." (Evid. Code, § 952.) Consequently, the communications were not privileged.

## FACTS

Holmes began working for Petrovich as his executive assistant in early June 2004.

The employee handbook, which Holmes admitted reading and signing, contained provisions clearly spelling out the policy concerning use of the company's technology resources, such as computers and e-mail accounts. The handbook directs employees that the company's technology resources should be used only for company business and that employees are prohibited from sending or receiving personal e-mails. Moreover, the handbook warns that "[e]mployees who use the Company's Technology Resources to create or maintain personal information or messages have no right of privacy with respect to that information or message." The "Internet and Intranet Usage" policy in the handbook specifically states, "E-mail is not private communication, because others may be able to read or access the message. E-mail may best be regarded as a postcard rather than as a sealed letter. . . ." The handbook spells out further that the company may "inspect all files or messages . . . at any time for any reason at its discretion" and that it would periodically monitor its technology resources for compliance with the company's policy.

The handbook also set forth the company's policy regarding harassment and discrimination. It directs an employee who thinks that he or she has been subjected to harassment or discrimination to immediately report it to Petrovich or Cheryl Petrovich, who was the company's secretary and handled some human resources functions. If the complaining party is not comfortable reporting the conduct to them, the report should be made to the company's controller. The policy promises that the complaint will be taken seriously, it will be investigated thoroughly, and there will be no retaliation. The policy also urges the employee, when possible, to confront the person who is engaging in the unwanted conduct and ask the person to stop it.

The next month, July of 2004, Holmes told Petrovich that she was pregnant and that her due date was December 7, 2004. Petrovich recalled that Holmes told him she planned to work up until her due date and then would be out on maternity leave for six weeks.

Holmes did not like it when coworkers asked her questions about maternity leave; she thought such comments were inappropriate. She asked "[t]hat little group of hens" to stop, and they complied. Holmes recalled having about six conversations with Petrovich about her pregnancy, during which they discussed her belly getting big and baby names. She thought "belly-monitoring" comments were inappropriate, but never told Petrovich that he was being offensive.

On Friday morning, August 6, 2004, Petrovich sent Holmes an e-mail discussing various topics, including that they needed to determine how they were going to handle getting a qualified person to help in the office who would be up to speed while Holmes was on maternity leave. He explained that, given his schedule and pace, this would not be a simple task. Thus, they needed to coordinate the transition so neither he nor Holmes would be stressed about it before or after Holmes left on maternity leave. Petrovich stated: "My recollection from the email you sent me when you told me you were pregnant and in our subsequent conversations, you are due around December 7th and will be out six weeks. We are usually swamped between now and the third week of December. The good news is between the third week of December to the second week of January, it slows down a little."

Holmes e-mailed Petrovich a few hours later and advised him that she estimated starting her maternity leave around November 15, and that the time estimate of six weeks might not be accurate as she could be out for the maximum time allowed by the employee handbook and California law, which is four months. She did not expect to be gone for the full four months but thought she should mention it as a possibility. Holmes believed that "Leslie" was "capable of picking up most of the slack" while Holmes was gone, and that the company could hire a "temp just to cover some of the receptionist duties so that Leslie could be more available . . . ."

A short time later, Petrovich responded, "I need some honesty. How pregnant were you when you interviewed with me and what happened to six weeks? Leslie is not and cannot cover your position, nor can a temp. That is an extreme hardship on me, my business and everybody else in the company. You have rights for sure and I am not going to do anything to violate any laws, but I feel taken advantage of and deceived for sure."

Holmes replied that she thought the subject was better handled in person, "but here it goes anyway. [¶] I find it offensive that you feel I was dishonest or deceitful. I wrote a very detailed email explaining my pregnancy as soon as the tests from my amniocentesis came back that everything was 'normal' with the baby. An amnio cannot be performed until you are nearly 4 months pregnant, hence the delay in knowing the results. I am 39 years old, and

therefore, there was a chance that there could be something 'wrong' or 'abnormal' with the baby. If there had been, I had decided not to carry the baby to term. That is a very personal choice, and not something that I wanted to have to share with people at work; so in order to avoid that, I waited until I knew that everything was o.k. before telling anyone I was pregnant. [¶] I've also had 2 miscarriages at 3 months into my pregnancy, and could not bear having to share that with co-workers again, as I have in the past. [¶] These are very important and personal decisions that I made. I feel that I have the right to make these decisions, and there is no deceit [sic] or dishonesty involved with this. On a more professional level; there is no requirement in a job interview or application to divulge if you are pregnant or not; in fact, I believe it's considered unethical to even inquire as to such. [¶] At this point, I feel that your words have put us in a bad position where our working relationship is concerned, and I don't know if we can get past it. [¶] As long as we're being straightforward with each other, please just tell me if what you are wanting at this time, is for me to not be here anymore, because that is how it feels. [¶] I need to go home and gather my thoughts."

Because he was concerned that Holmes might be quitting, Petrovich forwarded their e-mail exchange to Cheryl Petrovich; Lisa Montagnino, who handled some human resources functions; in-house counsel Bruce Stewart; and Jennifer Myers, who handled payroll and maintained employee files.

Petrovich also e-mailed Holmes as follows: "All I ever want is for people to be honest with me. The decision is all yours as to whether you stay here. I am NOT asking for your resignation. I do have the right to express my feelings, so I can't help it if you feel offended if the dates and amount of time you told me you would be out on maternity leave no longer apply. I also never asked you about you [being] pregnant in our interview, so you mentioning unethical behavior is out of place. I think you are missing the whole point here. I am trying to keep my business organized and I was working off information you told me. When you disclosed, only upon me asking, that what you told me is incorrect and that you had already decided on a maternity leave date without ever informing me, I [have] the right to question [the] information and not be subject to being quoted California law or my own handbook. You obviously are well versed on all of this which speaks volumes. No, you are not fired. Yes, you are required to be straight with your employer. If you do not wish to remain employed here, I need to know immediately."

On Monday morning, August 9, 2004, Holmes sent an e-mail to Petrovich, who was vacationing in Montana. She explained that she had thought about things a lot over the weekend and felt that what occurred on Friday could have been avoided if they had communicated in person. She enjoyed her

employment and took it as a compliment that Petrovich was worried about filling her shoes in her absence. Holmes stated, "I may only be gone 6 weeks, but I don't want to commit to that, because unforeseen circumstances can happen making my absence continue slightly longer. The max is 4 months, and that is only if there are disability issues; which I don't anticipate in my case, but I wanted to give you the 'outside' number, so you wouldn't be left with any surprises. [¶] I am happy about my pregnancy and happy about my job; I'd like to feel good about continuing to work here, in a positive and supportive environment up until my maternity leave in November, and I would like to return shortly thereafter. [¶] If we are on the same page, please let me know. I will do whatever I can to accommodate you while I'm gone; I can work from home, or come in a few hours a day; I am very flexible and hope that we will be able to work out the bumps along the way."

Petrovich replied that he agreed with Holmes's e-mail and saw things the way that she did. He stated, "I agree we do need to communicate. I need [to] admit I was in shock when you told me you were pregnant so soon after you started work. Right or wrong, I felt entrapped. It's a 'no win' for an employer. Yes, I am happy for you, but it was building in me and I decide[d] to approach it by asking if your plans were still as represented. When everything got moved up, I felt even worse. I know I have no right to feel this way by law or as an employer, but I am human in a tough business where people are constantly trying to take advantage of me. Remember what I said about loyalty in our interview? The person closest to me in the office has been the person in your position. When this happened, it greatly upset me since I was hoping for the very best foundation for us since I have been pleased with your efforts and because it had been a while since I have found someone committed to do what is a tough job. It will take some time for me to 'get over it' but I will and I want you to stay. It will work."

Early the next morning, August 10, 2004, Holmes replied, "Thank you Paul. I understand your feelings, you understand mine; let's move forward in a positive direction, and remember, 'this too shall pass'." She then discussed some business matters, said that everyone was thinking of Petrovich and his family, and stated that "Norman and Oliver say meow and woof!"

At some point after she e-mailed Petrovich, Holmes learned that Petrovich had forwarded their e-mails regarding her pregnancy to Cheryl Petrovich, Bruce Stewart, Lisa Montagnino, and Jennifer Myers. Although she never asked Petrovich not to forward the e-mails to others, and she conceded the e-mails did not contain any language communicating that the information was to be kept private, Holmes was very upset because she "thought that it went without saying" the e-mails should not be disseminated to others.

On August 10, 2004, Holmes saw her doctor for routine obstetric care and complained about being harassed at work regarding her upcoming pregnancy disability leave. According to the doctor, Holmes was "moderately upset" and "somewhat tearful." He advised her that the best course of action would be to discuss the matter directly with her boss baout how she feels and remedy the situation. If the harassment continued, then she might benefit from the assistance of a lawyer.

At 3:30 p.m. on the same day that Holmes saw her doctor and had e-mailed Petrovich that they could move forward in a positive direction, Holmes used the company computer to e-mail an attorney, Joanna Mendoza. Holmes asked for a referral to an attorney specializing in labor law, specifically relating to pregnancy discrimination. When Mendoza asked what was going on, Holmes replied that her boss was making it unbearable for her. He said things that were upsetting and hurtful, and had forwarded personal e-mail about her pregnancy to others in the office. Holmes stated, "I know that there are laws that protect pregnant women from being treated differently due to their pregnancy, and now that I am officially working in a hostile environment, I feel I need to find out what rights, if any, and what options I have. I don't want to quit my job; but how do I make the situation better." Holmes explained that her boss had accused her of being dishonest because she underestimated her maternity leave, that he had forwarded a personal e-mail and made it "common reading material for employees," and that he had made her feel like an "outcast." Holmes forwarded to Mendoza a few of Petrovich's e-mails.

At 4:42 p.m. on the same day, Mendoza e-mailed Holmes that she should delete their attorney-client communications from her work computer because her employer might claim a right to access it. Mendoza suggested they needed to talk and, while they could talk on the phone, she "would love an excuse to see [Holmes] and catch up on everything." Mendoza stated they could meet for lunch the next day. Holmes agreed and said she would come to Mendoza's law office, at which time Mendoza could see her "big belly."

On the evening of August 11, 2004, after her lunch with Mendoza, Holmes e-mailed Petrovich saying that Holmes had been upset since his first e-mail on Friday. She had been in tears, her stomach was in knots, and she realized that they would be unable "to put this issue behind us." She stated, "I think you will understand that your feelings about my pregnancy; which you have made more than clear, leave me no alternative but to end my employment here." Holmes advised Petrovich that she had cleared her things from her desk and would not be returning to work. Holmes also e-mailed Jennifer Myers stating that she was quitting and advising her where to send the final paycheck.

In September of 2005, Holmes filed a lawsuit against defendants, asserting causes of action for sexual harassment, retaliation, wrongful termination in violation of public policy, violation of the right to privacy, and intentional infliction of emotional distress. She alleged that the negative comments in Petrovich's e-mails and his dissemination of her e-mails, which contained highly personal information, invaded her privacy, were intended to cause her great emotional distress, and caused her to quit her job to avoid the abusive and hostile work environment created by her employer. According to Holmes, Petrovich disseminated the e-mails to retaliate against her for inconveniencing him with her pregnancy and to cause her to quit. Holmes claimed she was constructively terminated in that continuing her employment with Petrovich "became untenable, as it would have been for any reasonable pregnant woman."

On November 17, 2006, defendants filed a motion for summary judgment or summary adjudication on the ground that, as a matter of law, Holmes could not establish any of her causes of action. Defendants argued Holmes could not establish (1) that there was an objectively or subjectively hostile work environment; (2) that she suffered an adverse employment action in retaliation for her pregnancy; (3) that she suffered an adverse employment action that would cause a reasonable person to quit; (4) that Holmes had a reasonable expectation of privacy in her e-mails; or (5) that Petrovich's conduct was extreme and outrageous.

The trial court granted the motion for summary adjudication as to three of the causes of action. The court ruled that, although there was evidence that Holmes subjectively perceived her workplace as hostile or abusive, there must also be evidence that the work environment was objectively offensive. "The undisputed brief, isolated, work-related exchanges between her and Mr. Petrovich, and others in the office, could not be objectively found to have been severe enough or sufficiently pervasive to alter the conditions of her employment and create a hostile or abusive work environment based upon her pregnancy." As for Holmes's claims for retaliation and constructive discharge, there was no evidence she experienced an adverse employment action, and no evidence from which a reasonable trier of fact could find that Petrovich "intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of [Holmes's] resignation that a reasonable employer would realize that a reasonable person in [her] position would be compelled to resign."

The trial court denied the motion for summary adjudication as to the causes of action for invasion of privacy and intentional infliction of emotional distress. The court ruled that, despite Holmes's use of e-mail to communicate private information to Petrovich, and despite the company's policy regarding

the nonprivate nature of electronic communications, triable issues of fact remained regarding whether Petrovich's dissemination of the information to other people in the office breached Holmes's right to privacy or whether the disclosure was privileged, and that issues of fact remained concerning whether the disclosure was egregious and outrageous.

The trial of those two causes of action resulted in a defense verdict.

## DISCUSSION

### I

Holmes contends the trial court erred in granting defendants' motion for summary adjudication on her causes of action for sexual harassment, retaliation, and constructive discharge.

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Legal questions are considered de novo on appeal. (*Unisys Corp. v. California Life & Health Ins. Guarantee Assn.* (1998) 63 Cal.App.4th 634, 637 [74 Cal.Rptr.2d 106].) However, we must presume the judgment is correct, and the appellant bears the burden of demonstrating error. (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 [41 Cal.Rptr.2d 362, 895 P.2d 469].)

Viewing Holmes's specific contentions within the context of the appropriate legal framework, we find no error.

### A

First, Holmes contends the trial court erred in granting summary adjudication with respect to her cause of action for sexual harassment.

The California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) makes it an unlawful employment practice for an employer, "because of . . . sex, . . . to harass an employee." (Gov. Code, § 12940, subd. (j)(1).) Under FEHA, " 'harassment' because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions." (Gov. Code, § 12940, subd. (j)(4)(C).)

There are two theories upon which sexual harassment may be alleged: quid pro quo harassment, where a term of employment is conditioned upon

submission to unwelcome sexual advances, and hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment. (*Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1414 [26 Cal.Rptr.2d 116].) Holmes pursued the latter.

■ To prevail on a claim of hostile work environment sexual harassment, an employee must demonstrate that he or she was subjected to sexual advances, conduct, or comments that were (1) unwelcome, (2) because of sex, and (3) sufficiently severe or pervasive to alter the conditions of his or her employment and create an abusive work environment. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 [42 Cal.Rptr.3d 2, 132 P.3d 211] (hereafter *Lyle*).)

" ' "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [Citation.]' [Citation.] Therefore, to establish liability in a FEHA hostile work environment sexual harassment case, a plaintiff employee must show she was subjected to sexual advances, conduct, or comments that were *severe enough or sufficiently pervasive to alter the conditions of her employment and create a hostile or abusive work environment.*" (*Lyle, supra*, 38 Cal.4th at p. 283, original italics.) "With respect to the pervasiveness of harassment, courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." (*Ibid.*)

■ "To be actionable, 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' [Citations.] *That means a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, considering all the circumstances, would not share the same perception.* Likewise, a plaintiff who does not perceive the workplace as hostile or abusive will not prevail, even if it objectively is so." (*Lyle, supra*, 38 Cal.4th at p. 284, italics added.)

Relying on *Lyle*, the trial court found that, although Holmes subjectively perceived her workplace as hostile, it was not an abusive environment from an objective standpoint as a matter of law. Holmes claims the trial court erred in relying on *Lyle* because the facts in that case are distinguishable. But the trial court did not grant Petrovich's motion based on a factual comparison to

*Lyle*; it simply used the standard of review established therein as it was required to do, and as are we, under principles of stare decisis. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Holmes contends the proper standard in sexual harassment cases is whether a reasonable woman would consider the work environment a hostile one and, hence, the standard in pregnancy discrimination cases should be whether a reasonable pregnant woman would consider her work environment hostile. Thus, Holmes asserts, "Unless there was undisputed evidence that [she] was an *unreasonable* pregnant woman, it is oxymoronic that the lower court found the conduct at issue subjectively offensive but not 'objectively' offensive to a reasonable pregnant woman in [her] position. . . . Quite frankly, the issue of 'objectively offensive conduct' should have been left to the trier of fact and not been a question of law for the judge to have decided, especially if it was clear that there was subjective offense and highly questionable conduct at issue." (Original italics.)

Holmes's argument is not persuasive. An evaluation of all the circumstances surrounding Holmes's employment discloses an absence of evidence from which a reasonable jury could objectively find that Petrovich created a hostile work environment for a reasonable pregnant woman. During the two months Holmes worked for Petrovich, there was no severe misconduct or pervasive pattern of harassment. Holmes claims that her coworkers treated her differently based upon her pregnancy by asking about her maternity leave, but she admits that, when she asked them to stop, they complied.

Holmes points to the e-mails she exchanged with Petrovich on August 6 and 9, 2004, in which he implied she had deceived him about her pregnancy, stated he was offended that she had changed the period of time she would be absent for maternity leave, and asserted that her pregnancy was an extreme hardship on his business. She also complains that Petrovich unnecessarily forwarded to others her e-mail containing personal information about her age, prior miscarriages, and the possibility she would have terminated her pregnancy if the amniocentesis results had revealed problems with the fetus. Holmes asserts that Petrovich did this to humiliate her. Petrovich said he sent the e-mails to in-house counsel and employees involved in human relations because he thought that Holmes was about to quit.

When viewed in context, the e-mails (set forth at length, *ante*) show nothing more than that Petrovich made some critical comments due to the stress of being a small business owner who must accommodate a pregnant woman's right to maternity leave. He recognized Holmes's legal rights, stated he would honor them, said he was not asking for her resignation, noted he

had been pleased with her work, and simply expressed his feelings as a "human in a tough business where people are constantly trying to take advantage of me." He assured Holmes that "it will work." Rather than giving him a chance to honor his promise, Holmes quit.

It appears Holmes expects FEHA to be a civility code. It is not. (*Lyle, supra*, 38 Cal.4th at p. 295.) As we stated above, there is no recovery for harassment that is occasional, isolated, sporadic, or trivial. (*Id.* at p. 283.) Rather, a plaintiff must show a concerted pattern of harassment that is repeated, routine, or generalized in nature. (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 142 [68 Cal.Rptr.3d 568].) Holmes failed to do so. The isolated incidents to which she points are objectively insufficient.

Holmes relies on three cases for the proposition that harassment need not be pervasive and may be established by only a few instances of conduct over a short period of time. She fails to recognize that harassment need not be pervasive *if it is sufficiently severe* enough to alter the conditions of employment. (*Lyle, supra*, 38 Cal.4th at p. 283 [the plaintiff must be subjected to conduct or comments severe enough *or* sufficiently pervasive to alter the conditions of her employment and create a hostile work environment].) The cases upon which Holmes relies are not remotely similar to her situation in that they all involve egregious and severe conduct that unquestionably was abusive. In *Hostetler v. Quality Dining, Inc.* (7th Cir. 2000) 218 F.3d 798, the plaintiff's harasser engaged in three incidents over a one-week period of time: (1) he forced his tongue into her mouth, (2) he attempted to kiss her again and to remove her bra, and (3) he told her that he could perform oral sex so effectively he could make her do cartwheels. (*Id.* at pp. 802, 807–808.) In *Erdmann v. Tranquility Inc.* (N.D.Cal. 2001) 155 F.Supp.2d 1152, a homosexual employee's boss insisted that the employee become heterosexual, convert to the employer's Mormon faith, and lead the company's prayer service. (*Id.* at pp. 1160–1161.) And in *Mayfield v. Trevors Store, Inc.* (N.D.Cal., Dec. 6, 2004, No. C-04-1483 MHP) 2004 WL 2806175, the employer not only made comments that made the plaintiff feel stigmatized due to her pregnancy, the employer also wrote negative performance evaluations, assigned the plaintiff large amounts of extra work, and denied her a sick day.

Petrovich did not engage in any similarly egregious conduct, and he provided a nondiscriminatory explanation for his conduct. Because Holmes produced no evidence from which a reasonable jury could infer the existence of a hostile work environment, the trial court correctly granted the motion for summary adjudication on this cause of action.

## B

Next, Holmes contends the court erred in granting the motion for summary adjudication on her cause of action for constructive discharge. According to Holmes, she "found the extreme stress associated with being out of work to be preferable to the treatment she was receiving at Petrovich." This claim fares no better than her last.

■ "Constructive discharge occurs only when the employer coerces the employee's resignation, either by creating working conditions that are intolerable under an objective standard, or by failing to remedy objectively intolerable working conditions that actually are known to the employer." (*Mullins v. Rockwell Internat. Corp.* (1997) 15 Cal.4th 731, 737 [63 Cal.Rptr.2d 636, 936 P.2d 1246].) The conditions prompting resignation must be "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1246 [32 Cal.Rptr.2d 223, 876 P.2d 1022], disapproved on other grounds in *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) The resignation must be coerced, not merely a rational option chosen by the employee. (*Turner*, at p. 1247.)

From an objective standpoint, the trial court correctly granted summary adjudication. "Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." (*Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 930.) As discussed above, Holmes failed to present sufficient evidence of a hostile work environment. Thus, her wrongful termination claim necessarily fails. (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1381 [62 Cal.Rptr.3d 200] (hereafter *Jones*).)

## C

The trial court also granted summary adjudication on Holmes's cause of action for retaliation, ruling there was no evidence of an adverse employment action by Petrovich. We agree.

Holmes argues that she was subjected to negative comments and accusations about her pregnancy, followed by Petrovich's retaliatory conduct when she told him she planned to exercise her leave rights—he retaliated by forwarding her sensitive personal information to others in the office, who had

no reason to know about her prior miscarriages, amniocentesis, and potential termination of her pregnancy.

This is insufficient to establish an adverse employment action by Petrovich.

■ An " 'adverse employment action,' " which is a critical component of a retaliation claim (*Jones, supra*, 152 Cal.App.4th at p. 1380), requires a "substantial adverse change in the terms and conditions of the plaintiff's employment" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1454, 1455 [116 Cal.Rptr.2d 602]). "[A] mere offensive utterance or . . . a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of [the FEHA] . . . ." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (hereafter *Yanowitz*).) "However, a series of alleged discriminatory acts must be considered collectively rather than individually in determining whether the overall employment action is adverse [citations] and, in the end, the determination of whether there was an adverse employment action is made on a case-by-case basis, in light of the objective evidence." (*Jones, supra*, 152 Cal.App.4th at p. 1381.)

Here, Petrovich did not reduce Holmes's salary, benefits or work hours, and did not terminate her. He assured Holmes that she still had a job and that they would work things out. Holmes chose to quit because Petrovich expressed his concerns about the changes in her pregnancy leave dates and the need to replace her while she was on leave, and because he forwarded an e-mail that she wished to keep private. But she failed to demonstrate there was a triable issue of fact concerning whether he did these things to retaliate against her; she simply concluded that this was his motivation by taking out of context certain comments that he made. Holmes overlooks her own evidence, submitted in opposition to defendants' motion, which demonstrated that Petrovich forwarded the e-mail only to people he believed needed to know that Holmes had changed the anticipated date of her pregnancy leave and that she might be quitting. The fact that he forwarded her entire e-mail, rather than editing it or drafting a new one, does not demonstrate any animus toward her, given there was no clear directive in her e-mail that she did not wish others to see it.

More importantly, "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable . . . ." (*Yanowitz, supra*, 36 Cal.4th at p. 1054.) That is what occurred here. A reasonable person would have talked

to Petrovich, expressed dismay at his actions, given him an opportunity to explain or apologize, and waited to see if conditions changed after the air had cleared. Instead, Holmes chose to quit despite Petrovich's assurances that he wanted her to stay and that things would work out.

For the reasons stated above, the trial court correctly granted defendants' motion for summary adjudication.[2]

## II

Holmes's remaining claims of error all arise from an alleged violation of her attorney-client privilege.

She contends the trial court abused its discretion in (1) denying her motion demanding the return of privileged documents, (2) permitting the introduction of the documents at trial, and (3) giving a limiting instruction that undermined her cause of action for invasion of privacy. She argues that the cumulative prejudicial effect of these errors requires reversal of the judgment.

Her arguments are premised on various statutes governing the attorney-client privilege as follows:

Evidence Code section 954 states in relevant part: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ." (Further section references are to the Evidence Code unless otherwise specified.)

Section 952 provides that a "confidential communication between client and lawyer" is "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons

---

[2] In her reply brief, Holmes says the court should have denied the motion for summary adjudication in its entirety because it was not timely served. This argument is forfeited because it is raised for the first time in her reply brief without a showing of good cause. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 [66 Cal.Rptr.2d 319, 940 P.2d 906]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764–765 [60 Cal.Rptr.2d 770].) "Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432]; see *Reichardt v. Hoffman, supra,* 52 Cal.App.4th at pp. 764–765.) In any event, in overruling Holmes's objection to the defect in service, the court did not err in ruling Holmes waived the defect by filing an opposition and appearing at the hearing on the motion. (*Carlton v. Quint* (2000) 77 Cal.App.4th 690, 696–698 [91 Cal.Rptr.2d 844].)

other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted . . . ." (§ 952.)

Section 917 states in relevant part: "(a) If a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential. [¶] (b) A communication . . . does not lose its privileged character for the sole reason that it is communicated by electronic means or because persons involved in the delivery, facilitation, or storage of electronic communication may have access to the content of the communication. . . ."

Section 912, subdivision (a) provides that the right of any person to claim a lawyer-client privilege "is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege."

With this statutory framework in mind, we turn to Holmes's specific contentions.

## A

Holmes argues the trial court erred in denying her motion for discovery sanctions, seeking return of the e-mails that she sent her attorney, Joanna Mendoza, using the company's computer. We disagree.

During a deposition, defense counsel questioned Holmes about her e-mail correspondence with her attorney. Mendoza objected on the ground of attorney-client privilege.

Mendoza then wrote to defense counsel, Kevin Iams, demanded the return of the e-mails, and said she would seek a protective order if he refused. Iams replied that Holmes made a knowing waiver of the privilege when she communicated with counsel on the company's e-mail system after being advised that her e-mails were not private. Nevertheless, Iams wrote, "I recognize that this is not an area in which the law is settled. . . . What I propose as a resolution is a stipulated protective order whereby I and my

clients will agree that we will not use the emails or facsimile copies in any deposition or court proceeding, unless we provide you written notice 45 days in advance. This will allow us further time to meet and confer, obtain a further protective order, or if necessary, to seek the court's intervention."

Mendoza initially refused the proposed resolution, but then agreed. On May 15, 2006, Iams wrote a confirmation letter stating that Mendoza agreed to delay filing for a protective order pending a review of the "proposed protective order" that Iams would draft, wherein he would agree not to use the documents in any deposition or court proceeding without first giving Mendoza 45 days' written notice. The letter noted, however, that "by entering into the protective order, neither side is waiving any arguments it may have regarding the appropriate use of the [e-mails]." Stating that his schedule that week was hectic, Iams said he would strive to have a draft of the protective order to Mendoza by the end of the week for her review.

Before Iams drafted the stipulated protective order, Attorney Robin Perkins substituted in as defendants' counsel. Thereafter, Perkins used the e-mails in support of defendants' motion for summary judgment.

Holmes demanded that defendants withdraw the e-mail evidence, in accord with their agreement not to use it without prior notice. She submitted a declaration objecting to use of the attorney-client e-mails, claiming they were privileged.

Responding that the parties had never agreed not to utilize the e-mails, and that no protective order had ever been executed, defendants objected to Holmes's declaration that the e-mails were privileged. In defendants' view, the declaration was improper lay opinion, and Holmes had waived the attorney-client privilege. They pointed out that Holmes's counsel specifically permitted defendants' counsel to ask questions concerning the e-mails, stating: "If the only extent of your questions are going to be about this e-mail exchange, *and you're not going to go into a follow-up meeting that was had or any other communications with her attorney*, and it's not going to be considered a waiver of any of *those communications*, then I have no problem with it." (Italics added.)

The trial court sustained defendants' objections and did not exclude the e-mail evidence.

Thereafter, Holmes sought discovery sanctions for defendants' failure to return the e-mails and for violating the agreement not to use them without affording Holmes prior notice.

Defendants opposed the motion on the grounds that the parties never reached a written stipulation; Holmes never filed a motion to compel, which

meant the court had never ordered Petrovich to return the documents; and the court had already found that the use of the e-mails did not violate the attorney-client privilege.

The court denied the motion for discovery sanctions, finding defendants had not engaged in any discovery abuse. It explained: "With respect to the e-mails that were submitted by defendants with the motion for summary judgment/adjudication, the Court found plaintiff had waived attorney-client privilege . . . ."

Holmes contests this ruling, asserting "no specific finding of waiver was made" in connection with the motion for summary judgment because defendants' objections to the claim of attorney-client privilege were made on multiple grounds, and the court merely sustained the objections without specifying the basis for its ruling. Thus, she argues, the court erred in relying on a nonexistent finding of waiver to deny the discovery sanctions motion.

Holmes overlooks that Judge Shelleyanne Chang presided over both the motion for summary judgment and/or adjudication and the motion for discovery sanctions. We presume that Judge Chang knew the basis for her own ruling sustaining defendants' objections in the first proceeding. Hence, Judge Chang did not err in relying on her prior determination that Holmes waived the attorney-client privilege. Furthermore, as we shall explain in the next part of the opinion, the e-mails were not privileged.

B

Holmes asserts the court erred in overruling her motion in limine to prevent defendants from introducing the aforementioned e-mails at trial to show Holmes did not suffer severe emotional distress, was only frustrated and annoyed, and filed the action at the urging of her attorney.

The court ruled that Holmes's e-mails using defendants' company computer were not protected by the attorney-client privilege because they were not private.

Holmes argues that the court did not understand the proper application of section 917, and thus erred in allowing introduction of the e-mail evidence. According to Holmes, "the California Legislature has already deemed [the fact that a communication was made electronically] to be irrelevant in determining whether a communication is confidential and therefore privileged." However, it is Holmes, not the trial court, who misunderstands the proper application of section 917.

■ Although a communication between persons in an attorney-client relationship "does not lose its privileged character for the sole reason that it is communicated by electronic means or because persons involved in the delivery, facilitation, or storage of electronic communication may have access to the content of the communication" (§ 917, subd. (b)), this does not mean that an electronic communication is privileged when (1) the electronic means used belongs to the defendant; (2) the defendant has advised the plaintiff that communications using electronic means are not private, may be monitored, and may be used only for business purposes; and (3) the plaintiff is aware of and agrees to these conditions. A communication under these circumstances is not a " 'confidential communication between client and lawyer' " within the meaning of section 952 because it is not transmitted "by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation . . . ." (*Ibid.*)

■ When Holmes e-mailed her attorney, she did not use her home computer to which some unknown persons involved in the delivery, facilitation, or storage may have access. Had she done so, that would have been a privileged communication unless Holmes allowed others to have access to her e-mails and disclosed their content. Instead, she used defendants' computer, after being expressly advised this was a means that was not private and was accessible by Petrovich, the very person about whom Holmes contacted her lawyer and whom Holmes sued. This is akin to consulting her attorney in one of defendants' conference rooms, in a loud voice, with the door open, yet unreasonably expecting that the conversation overheard by Petrovich would be privileged.

Holmes disagrees, but the decisions upon which she relies are of no assistance to her because they involve inapposite factual circumstances, such as Fourth Amendment searches and seizures by public or government employers (*Quon v. Arch Wireless Operating Co., Inc.* (9th Cir. 2008) 529 F.3d 892 (hereafter *Quon*), revd. *sub nom. Ontario v. Quon* (2010) 560 U.S. ___, ___ [177 L.Ed.2d 216, 231, 130 S.Ct. 2619]; *Leventhal v. Knapek* (2d Cir. 2001) 266 F.3d 64; *Convertino v. U.S. Dept. of Justice* (D.C. Cir. 2009) 674 F.Supp.2d 97, 110), or the use of a personal Web-based e-mail account accessed from an employer's computer where the use of such an account was not clearly covered by the company's policy and the e-mails contained a standard hallmark warning that the communications were personal, confidential, attorney-client communications. (*Stengart v. Loving Care Agency, Inc.* (2010) 201 N.J. 300 [990 A.2d 650, 659, 663–664].)

The present case does not involve similar scenarios. Holmes used her employer's company e-mail account after being warned that it was to be used

only for company business, that e-mails were not private, and that the company would randomly and periodically monitor its technology resources to ensure compliance with the policy. (Cf. *Scott v. Beth Israel Medical Center, Inc.* (N.Y.Sub.Ct. 2007) 17 Misc.3d 934 [847 N.Y.S.2d 436, 441–443] [despite a statute similar to § 917, an attorney-client privilege did not exist when a company computer was used to send e-mails, and the company's policy prohibited the personal use of e-mails, warned that they were not private, and stated that they could be monitored].)[3]

Holmes emphasizes that she believed her personal e-mail would be private because she utilized a private password to use the company computer and she deleted the e-mails after they were sent. However, her belief was unreasonable because she was warned that the company would monitor e-mail to ensure employees were complying with office policy not to use company computers for personal matters, and she was told that she had no expectation of privacy in any messages she sent via the company computer. Likewise, simply because she "held onto a copy of the fax," she had no expectation of privacy in documents she sent to her attorney using the company's facsimile machine, a technology resource that, she was told, would be monitored for compliance with company policy not to use it for personal matters.

According to Holmes, even though the company unequivocally informed her that employees who use the company's computers to send personal e-mail have "no right of privacy" in the information sent (because the company would periodically inspect all e-mail to ensure compliance with its policy against personal use of company computers), she nonetheless had a reasonable expectation that her personal e-mail to her attorney would be private because the " 'operational reality' was that there was no access or auditing of employee's computers." (Quoting *Quon, supra,* 529 F.3d 892, revd. *sub nom. Ontario v. Quon, supra,* 560 U.S. at p. ___ [177 L.Ed.2d at p. 231].)

In support of this contention, Holmes claims she "knew that her computer was password protected and that no one had asked for or knew her password, and the only person who had the ability to inspect the computers did not ever perform that task." This misrepresents the record in two respects. It is inaccurate to say only one person had the ability to monitor e-mail sent and received on company computers. The company's controller, who had an administrative password giving her access to all e-mail sent by employees

---

[3] Section 917, subdivision (b) is derived from the statute at issue in *Scott v. Beth Israel Medical Center, Inc., supra,* 847 N.Y.S.2d 436, New York's Civil Practice Law and Rules, section 4548, which states: "No communication privileged under this article shall lose its privileged character for the sole reason that it is communicated by electronic means or because persons necessary for the delivery or facilitation of such electronic communication may have access to the content of the communication." (See Cal. Law Revision Com. com., reprinted at 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 917, p. 267.)

with private passwords, testified that the company's "IT person" as well as company owner Cheryl Petrovich also had such access to e-mail sent and received by company computers. And at no time during her testimony did Holmes claim she knew for a fact that, contrary to its stated policy, the company never actually monitored computer e-mail. She simply said that, to her knowledge, no one did so.

In any event, Holmes's reliance on *Quon* is misplaced. There, a police sergeant, Jeff Quon, sued his employer, the Ontario Police Department, claiming it violated his Fourth Amendment right to be free of unlawful government searches and seizures when it reviewed text messages that he sent on an employer-issued text pager. (*Quon, supra*, 529 F.3d at p. 895.) In holding that Quon had a reasonable expectation of privacy in his text messages due to the operational realities of the workplace, the Ninth Circuit relied in large part on the plurality opinion in *O'Connor v. Ortega* (1987) 480 U.S. 709 [94 L.Ed.2d 714, 107 S.Ct. 1492] (hereafter *O'Connor*). (*Quon, supra*, 529 F.3d at pp. 903–904, 907.)

*O'Connor* held that the fact an employee works for the government does not negate the employee's Fourth Amendment right to be free of unreasonable governmental searches and seizures at work. (*O'Connor, supra*, 480 U.S. at pp. 715, 717 [94 L.Ed.2d at pp. 721, 723].) But "[t]he operational realities of the workplace . . . may make *some* employees' expectations of privacy unreasonable . . . ." (*Id.* at p. 717 [94 L.Ed.2d at p. 723].) For example, the existence of specific office policies, practices, and procedures may have an effect on public employees' expectations of privacy in their workplace. (*Ibid.*) "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." (*Id.* at p. 718 [94 L.Ed.2d at p. 723].)

Relying on *O'Connor*, the Ninth Circuit upheld the district court's determination that Quon had a reasonable expectation of privacy in his text messages because, despite a departmental policy that users of pagers had no right to privacy, the operational reality was that Quon was given an expressly conflicting message to the contrary by his supervisor. (*Quon, supra*, 529 F.3d at p. 907.) In addition to finding Quon had a reasonable expectation of privacy, the Ninth Circuit found the search was unreasonable in violation of the Fourth Amendment. (529 F.3d at pp. 908–909.)

The United States Supreme Court reversed this decision on the ground the search was not unreasonable. (*Ontario v. Quon, supra*, 560 U.S. at pp. ___–___ [177 L.Ed.2d at pp. 229–231].) Before turning to that issue, it noted that the parties disputed whether Quon had a reasonable expectation of privacy with respect to his pager messages. (*Id.* at p. ___ [177 L.Ed.2d at

p. 226].) Opting not to resolve this issue or whether the *O'Connor* "operational reality" test was applicable, the court observed that it "must proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment owned by a government employer. The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." (*Id.* at pp. ___–___ [177 L.Ed.2d at pp. 226–227].) "Even if the Court were certain that the *O'Connor* plurality's approach were the right one, the Court would have difficulty predicting how employees' privacy expectations will be shaped by those changes or the degree to which society will be prepared to recognize those expectations as reasonable. . . . And employer policies concerning communications will of course shape the reasonable expectations of their employees, especially to the extent that such policies are clearly communicated." (*Id.* at p. ___ [177 L.Ed.2d at p. 227], citation omitted.)

Here, we are not concerned with a potential Fourth Amendment violation because Holmes was not a government employee. And, even assuming the "operational reality" test applies, it is of no avail to Holmes because the company explicitly told employees that they did not have a right to privacy in personal e-mail sent by company computers, which e-mail the company could inspect at any time at its discretion, and the company never conveyed a conflicting policy. Absent a company communication to employees explicitly contradicting the company's warning to them that company computers are monitored to make sure employees are not using them to send personal e-mail, it is immaterial that the "operational reality" is the company does not actually do so. Just as it is unreasonable to say a person has a legitimate expectation that he or she can exceed with absolute impunity a posted speed limit on a lonely public roadway simply because the roadway is seldom patrolled, it was unreasonable for Holmes to believe that her personal e-mail sent by company computer was private simply because, to her knowledge, the company had never enforced its computer monitoring policy.

In sum, "so far as [Holmes was] aware," within the meaning of section 952, the company computer was not a means by which to communicate in confidence any information to her attorney. The company's computer use policy made this clear, and Holmes had no legitimate reason to believe otherwise, regardless of whether the company actually monitored employee e-mail. Thus, when, with knowledge of her employer's computer monitoring policy, Holmes used a company computer to e-mail her attorney about an employment action against her boss, Petrovich, Holmes in effect knowingly disclosed this information to a third party, the company and thus Petrovich, who certainly was not involved in furthering Holmes's interests in her consultation with her attorney (§ 952) because Petrovich was the party she eventually sued.

Hence, the trial court correctly ruled that the attorney-client communication was not privileged. (§ 952.)

## C

According to Holmes, the trial court erred when it gave the jury a protective admonishment about the attorney-client e-mails.

The court stated: "Jury, normally you may be shocked to see something like this on screen. However, I determined in proceedings prior to trial that this was not privileged information between an attorney and a client because it was communicated through company computers." When Holmes's attorney began to object, the court responded, "the jury needs to understand that we are not romping wholesale over the attorney/client privilege. And I don't want the jury to be offended by this type of correspondence."

After an unreported sidebar conference, the court stated: "I think I've made it clear to you [(the jurors)] why you're being permitted to see this kind of unusual correspondence, and the only reason you're able to see it is for the reasons I expressed earlier, namely that it was correspondence on a company computer, but that has nothing whatsoever to do with Miss Holmes' claim of privacy with respect to the pregnancy issues she communicated to Mr. Petrovich and her claims of emotional distress from that. [¶] So don't take my comments as any kind of indication how you should decide the merits of this case based upon this attorney/client communication. It's a very, very different issue. [¶] But I felt you should know why I'm permitting you to see this, because it's a very unusual kind of correspondence between a client and an attorney that normally juries would not see, but you're seeing it for that very limited purpose, but consider it only for the very limited purpose . . . and don't attach any importance to it on the main claim of Miss Holmes against [Petrovich]."

Holmes argues the above quoted comments undermined her invasion of privacy claim by more or less advising the jury she had no right to privacy in e-mails on a company computer. Not so.

The causes of action for invasion of privacy and intentional infliction of emotional distress were not premised on Petrovich accessing Holmes's attorney-client e-mails, but on his forwarding to her coworkers her private e-mails to him about her pregnancy. She claimed that this dissemination of intimate details concerning her pregnancy violated her right to privacy, that Petrovich's conduct was outrageous, and that it caused Holmes great emotional distress.

The court unambiguously advised the jury that Holmes's e-mails to her attorney were being introduced for a limited purpose, and the court's determination that they were not privileged because they were sent on a company computer had "nothing whatsoever to do with [her] claim of privacy" and her claims of emotional distress. Then, in response to jury questions during deliberations, the court advised the jury that an electronic data transmission may constitute an invasion of privacy if the elements of the tort are established by a preponderance of the evidence,[4] and that policies in an employer handbook could not supersede California law.

Holmes points to nothing indicating that the court's comments were a misstatement of the evidence or law. Unlike *Lewis v. Bill Robertson & Sons, Inc.* (1984) 162 Cal.App.3d 650 [208 Cal.Rptr. 699], upon which Holmes relies, the court did not commit misconduct and engage in partisan advocacy by expressing strong opinions on the ultimate issue at trial (*id.* at pp. 656–657), i.e., whether Petrovich invaded her right to privacy by forwarding to Holmes's coworkers the e-mails about her pregnancy. Under the circumstances, she has failed to meet her burden of establishing error. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] [it is the appellants' burden to establish error with reasoned argument and citations to authority].)

Holmes also fails to meet her burden of establishing that the alleged error was prejudicial. (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337 [98 Cal.Rptr.2d 136] [an appellant bears the burden of establishing prejudice by spelling out in his or her brief exactly how an alleged error caused a miscarriage of justice]; *American Drug Stores, Inc. v. Stroh, supra*, 10 Cal.App.4th at p. 1453 [appellants may not attempt to rectify their omissions and oversights for the first time in their reply briefs].) Holmes does not present a coherent argument explaining how the court's statement that her e-mails to her attorney were not privileged undermined her theory that Petrovich egregiously violated her privacy by forwarding e-mails about her difficult and sensitive pregnancy decisions to people she claimed had no legitimate business need to know about the matters discussed therein. Thus, Holmes fails to demonstrate that, but for the court's alleged errors, it is reasonably probable the jury would have returned a more favorable verdict. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801–802 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

---

[4] The court instructed the jury earlier that, to establish her claim for invasion of privacy, Holmes had to prove the following five elements: (1) she had a reasonable expectation of privacy in precluding the dissemination or misuse of sensitive and confidential information under the circumstances; (2) Petrovich invaded her privacy by disseminating or misusing her sensitive or confidential information; (3) the conduct was a serious invasion of her privacy; (4) she was harmed; and (5) Petrovich's conduct was a substantial factor in causing her harm.

## III

In her reply brief, Holmes attempts to raise a new argument challenging the jury's verdict on her cause of action for invasion of privacy. The argument is entitled, "ONE DOES NOT LOSE THEIR [*sic*] CONSTITUTIONAL RIGHT TO PRIVACY SIMPLY BY WALKING THROUGH THE ENTRANCE OF THE WORKPLACE."

She asserts that an employer cannot destroy the constitutional right to privacy via a company handbook without due consideration being paid; that an employee has a reasonable expectation of privacy when an employer's technology policy is not enforced; and that an employer violates an employee's right to privacy when he discloses private information about the employee without a legitimate business reason for doing so.

We decline to address this argument because it is raised for the first time in her reply brief and is thus forfeited. (*Garcia v. McCutchen, supra*, 16 Cal.4th at p. 482, fn. 10; *Reichardt v. Hoffman, supra*, 52 Cal.App.4th at pp. 764–765; *American Drug Stores, Inc. v. Stroh, supra*, 10 Cal.App.4th at p. 1453.)

### DISPOSITION

The judgment is affirmed.

Hull, Acting P. J., and Butz, J., concurred.