Filed 3/5/24  Royer v. Los Rios Community College District CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TINA ROYER, | C096484 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2021-00295849-CU-OE-GDS) |
| v. | |
| LOS RIOS COMMUNITY COLLEGE DISTRICT, | |
| Defendant and Appellant. | |

Tina Royer sued her employer, the Los Rios Community College District (the District), for six separate violations of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA) and for invasion of privacy.  She claims a coworker subjected her to harassment because of her race and religion, and the District discriminated against her because of her race and religion, retaliated against her for complaining about harassment, failed to prevent harassment, and failed to reasonably accommodate her disability.  She also claims that, after she filed a claim pursuant to the Government Claims Act (Gov. Code, § 810 et seq.), the District invaded her privacy by

1

publishing the claim on its Web site without redacting her home address and confidential information about her disability.

The District responded to the lawsuit by filing a special motion to strike pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] The District's motion was directed at the entirety of the causes of action for harassment and invasion of privacy, and portions of the causes of action for discrimination, retaliation, and failure to prevent harassment. The trial court granted the motion as to the discrimination cause of action and denied it as to the other causes of action.

The District appeals, and we reverse in part, affirm in part, and remand to the trial court to take further action as stated below.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2021, Royer filed a lawsuit against the District that alleged the following.

Royer was a tenured English professor with the District. For the previous13 years, she had worked at the Folsom Lake College campus, and during most of the relevant time period, she was the chair of the English department. Josh Fernandez was an English professor at Folsom Lake College. As department chair, Royer was Fernandez's supervisor.

Royer is Caucasian, Christian, married to a Christian minister, and active in her church, and "[h]er Christian background and conservative views are known to her colleagues" at Folsom Lake College. Fernandez is Hispanic and is affiliated with Antifa. Royer characterized Antifa as a "domestic terrorist organization," and she alleged Fernandez had a history of inciting violence, participating in violent protests, and

---

[1] The acronym SLAPP stands for "strategic lawsuits against public participation." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 & fn. 1.)

Undesignated statutory references are to the Code of Civil Procedure.

conducting targeted harassment campaigns against those who do not share his views.

In the fall of 2018, Fernandez was up for tenure, and Royer was one of three members of his tenure review committee. The other two members were BJ Snowden, the dean of Folsom Lake College, and Francis Fletcher, a member of the English department. During the tenure review process, all three committee members expressed concerns about Fernandez's conduct on campus, and Dean Snowden showed Royer copies of some of Fernandez's social media posts. Royer alleged one post stated "Kill your boss," some posts promoted violence against churches and school administrators, and some posts included photographs of Fernandez wearing a facemask and advertising a "Bash Back" rally. Because she was his boss, and because her classroom was directly next to his, Royer stated she understood these posts constituted a credible threat of violence against her.

All three members of the tenure review committee initially determined Fernandez did not meet the guidelines for granting tenure. Fernandez, however, had threatened to sue the District for attempting to curtail his activities on campus, and purportedly in response to his threat, Dean Snowden ultimately changed his mind about granting tenure. Royer claimed Dean Snowden and Folsom Lake College President Whitney Yamamura successfully pressured her to vote in favor of granting Fernandez tenure. Although Royer voted in favor of granting tenure, her evaluation included some "less than satisfactory" marks, and Fernandez received a copy of the evaluation. Shortly thereafter, a colleague told Royer that Fernandez was telling other department members he "hated" her "because he received a 'less than satisfactory' evaluation" from her.

Around this time, another colleague provided Royer with copies of more of Fernandez's social media posts. Royer characterized these posts as "expressing . . . hate for people who held the same views as" her. Royer became increasingly concerned about Fernandez's conduct and was afraid to be on campus.

Beginning in or around March 2019, Royer complained to the District about Fernandez's conduct and the effect it was having on her physical and mental health, and she asked that his classroom be moved so it was not next to hers. The District declined to move Fernandez's classroom, and offered to move her classroom instead, but she did not think she should have to move when she had done nothing wrong. She asked to work remotely in order to avoid interactions with Fernandez on campus. The District agreed she could teach classes and conduct department meetings online and advised her this would not affect her nonteaching responsibilities, such as her department chair and matriculation committee chair positions.

In June 2019, Dean Snowden told Royer that Fernandez had filed a grievance against the college, and in response to the grievance the college had agreed to revise his evaluation. Snowden told Royer she needed to remove the "unsatisfactory" marks she had given him and to leave only one "needs improvement" mark, but she refused.

In September 2019, Royer "made both formal and informal complaints about race and religious creed harassment perpetrated by Fernandez and directed at her by reporting unlawful harassment" to numerous District officials. That same month, she was informed she could no longer serve as department chair or matriculation committee chair because those functions could not be performed remotely. The loss of those positions lowered her income by approximately $1,500 per month.

In or around November 2019, Royer submitted a written discrimination claim to the District, and the District published that claim on its Web site in advance of the board meeting at which it would be discussed. The claim contained Royer's home address and information about her medical diagnosis. Royer alleged that, almost immediately after the claim and consequently her address were published, her home and church became the subject of targeted harassment by "[s]trangers" who "[met] the profile" of Antifa members. She alleged these strangers had: parked in her driveway; shone their lights into her house at night; driven up and down her street and parked across from her house;

4

openly stood in front of her house for extended periods of time; and taken photographs of her house and her family. Royer also alleged someone shot out a window of a car parked in her driveway, and she found a "horror film mask" hanging in a tree on her property. Royer and her family felt so threatened they temporarily relocated so they could install security monitoring equipment and they had considered moving.

Based on these allegations, Royer asserted seven causes of action against the District. Six causes of action alleged violations of FEHA: (1) *harassment* based on race and/or religion; (2) *discrimination* based on race and/or religion; (3) *retaliation* for reporting harassment and/or discrimination; (4) *failure to prevent* harassment, discrimination, and/or retaliation; (5) *failure to reasonably accommodate* a physical or mental disability; and (6) *failure to engage in the interactive process* to determine a reasonable accommodation. The seventh cause of action was for invasion of privacy.

The District filed an anti-SLAPP motion asking the court to strike the harassment and invasion of privacy causes of action in their entirety, to strike portions of the discrimination, retaliation, and failure to prevent causes of action, and to strike discrete allegations in the complaint.[2] It argued those causes of action and allegations arose in whole or in part from protected activity, and Royer could not demonstrate a probability of prevailing on the merits. In opposition to the motion, Royer argued none of the causes of action arose from protected activity, and even if they did, she could demonstrate a probability of prevailing. She supported her opposition with a declaration that provided additional details about her claims. She also attached copies of some of Fernandez's social media posts to her declaration and described others. We will discuss the evidence submitted in support of and opposition to the anti-SLAPP motion in the relevant discussion section, below.

---

**2**     The District did not move to strike the failure to reasonably accommodate or the failure to engage in the interactive process causes of action.

The trial court granted the motion to strike as to the discrimination claim, and denied it as to the claims for harassment, retaliation, failure to prevent, and invasion of privacy. As to the harassment, retaliation, and failure to prevent claims, the trial court found they arose from protected activity, but Royer demonstrated a probability of prevailing on the merits. As to the invasion of privacy cause of action, the court found it did not arise from protected activity.

The District filed a timely notice of appeal.[3]

## DISCUSSION

### I

### *Anti-SLAPP Principles and Standard of Review*

Section 425.16 is a procedural device for weeding out certain "meritless claims" at the early stages of litigation. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) It provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution . . . shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Courts frequently refer to acts in furtherance of a person's right of petition or free speech as "protected activity," and we will as well. (See *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009; *Park v. Board of Trustees of California State University* (2017)

---

**3**     Royer did not file a notice of appeal. Although she argues her discrimination claim should not have been stricken, we do not consider this argument because of the "well settled" rule that " ' "on appeal errors affecting a party who does not appeal will not be reviewed." ' " (*California Ins. Guarantee Assn. v. Liemsakul* (1987) 193 Cal.App.3d 433, 441; see also *Henigson v. Bank of America* (1948) 32 Cal.2d 240, 244 [" '[It] is well settled that parties who have not appealed cannot attack the findings, the only objections thereto which can be received being those urged by appellant' "].) We thus do not consider that portion of the trial court's order granting the motion to strike the discrimination claim.

2 Cal.5th 1057, 1062.)  Protected activity includes any statement or writing made in an official proceeding authorized by law or in connection with an issue under consideration or review in such a proceeding, and any exercise of the constitutional right of free speech. (§ 425.16, subd. (e).)

Resolution of a special motion to strike, also known as an anti-SLAPP motion, "requires the court to engage in a two-step" process.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  At the first step, the defendant has the burden of establishing the challenged claim arises from protected activity.  (*Id*. at p. 61.)  Our Supreme Court has recently explained that, in order to determine whether the defendant has met its burden, the court must "identify the activity" by the defendant on which the challenged claim rests, and then determine whether "that activity is protected by the anti-SLAPP statute."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)  The court "must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability,' " and must "evaluate whether the defendant has shown any of these actions fall within one or more of the four protected categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Ibid*., italics omitted.)  "If the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute," then the claim arises from protected activity, and the court proceeds to the second step.  (*Id*. at p. 887.)

At the second step, the plaintiff has the burden of "establish[ing] that there is a probability [it] will prevail on the claim."  (§ 425.16, subd. (b)(1).)  The plaintiff's burden is not heavy, and it "need only establish that [its] claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP."  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)  In order to meet its burden, "the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment."  (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 108.)  Our Supreme Court has "described this second step as a

7

'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' " (*Baral, supra*, 1 Cal.5th at pp. 384-385, fn. omitted.)

In ruling on an anti-SLAPP motion, the court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) The court analyzes each challenged cause of action separately, and may strike some causes of action, while allowing others to remain. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928.) It may also strike discrete portions of a cause of action that arise out of protected activity. (*Baral, supra*, 1 Cal.5th at pp. 393-394.)

We review de novo the grant or denial of an anti-SLAPP motion, and we exercise our independent judgment in determining whether the challenged claims arise from protected activity. (*Park v. Board of Trustees of California State University, supra*, 2 Cal.5th at p. 1067.)

We discuss the District's arguments largely in the order in which they were made.

II

*Analysis*

1. *Invasion of Privacy Cause of Action*

The invasion of privacy cause of action is based on the following allegations and evidence.

On September 5, 2019, Royer submitted to the District a single document that contained both a discrimination complaint and a notice of claim under the Government Claims Act. She utilized the District's "Discrimination Complaint Form," which is a fill-

8

in-the-blank form that asks for the complainant's name, address, and phone number. She "very specifically typed" on the form that it was also a "Government Tort Claim (Gov't Code Sections 905, et seq.)." There was a three-page attachment to the form captioned "Attachment to Discrimination Complaint Form and Government Tort Claim." The attachment reiterated, "This is . . . submitted as and also intended to be [a] . . . Notice of a Government Tort Claim pursuant to" the Government Claims Act. The attachment contained a narrative description of Royer's complaints that repeated many of the same allegations made in this lawsuit, and that disclosed her medical diagnosis.

The District submitted a declaration from Jacob Knapp, its associate vice chancellor of human resources. Knapp stated the District's "standard practice" at the time was to place government tort claims on the agenda for consideration by its board in open session at the next regularly scheduled board meeting. Its standard practice was also to include agenda materials with the agenda, and to post both the agenda and agenda materials on its Web site. Consistent with its standard practice, the District placed Royer's claim on the agenda for consideration by the board in open session at its November 13, 2019, meeting, and it included a copy of the claim with the agenda materials. Royer's claim was thus part of the agenda materials that were posted on the District's Web site.

Royer stated that "within days of [the District] publishing my home address," she began being stalked and harassed at her home and her church by "[s]trangers" meeting the profile of Antifa protagonists. Royer did not contend Fernandez was one these "[s]trangers." In addition to repeating the allegations in the complaint, Royer's declaration provided additional details about the harassment, including that she observed individuals sitting outside her church taking photographs of the license plates of parishioners' cars, and in January 2020, her church was broken into and ransacked.

As alleged in the complaint, the invasion of privacy cause of action is based on the District's publication of Royer's claim on its Web site without redacting her home address and medical information, and the harm that befell her as a result.

The District argued in its anti-SLAPP motion that publishing Royer's claim was protected activity as defined by the anti-SLAPP statute, and that Royer's invasion of privacy claim arises from that act. The trial court disagreed, and found the gravamen of Royer's invasion of privacy claim "is not the publication of the Tort Claim itself, but the inclusion of her private medical and identifying information unnecessarily," and the District failed to meet "its initial burden to establish that the publication of [Royer's] Government Tort Claim in full without redactions arises from protected activity under section 425.16." The trial court thus denied the motion at the first step and did not address the second step.

The District challenges the trial court's finding that the invasion of privacy claim does not arise out of protected activity.

Protected activity includes (1) "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," and (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(1), (e)(2).) The District argues a public entity's receipt and consideration of a claim submitted pursuant to the Government Claims Act is an official proceeding authorized by law within the meaning of the anti-SLAPP statute, and that its publication of such a claim on its Web site is a statement made in such a proceeding and/or a statement made in connection with an issue under consideration or review in such a proceeding.[4] We agree.

---

[4] The District also argues consideration of a government tort claim is a legislative, executive, and judicial proceeding, and publishing Royer's claim was a statement made

10

The phrase "official proceeding authorized by law" includes "proceedings required by statute." (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 764.) The Government Claims Act and the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) (the Brown Act) are two such statutes, and both support the District's argument that publishing Royer's claim constituted protected activity.

The Government Claims Act "require[s], as a condition precedent to bringing suit for 'money or damages' against a . . . public entity, the timely presentation to the defendant of a written claim and the rejection of that claim in whole or in part." (*Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1078, italics omitted.) It contains detailed procedures for presenting and considering claims. Among other things, the claim must be in writing and must include the claimant's address and a description of "the occurrence or transaction which gave rise to the claim asserted." (Gov. Code, § 910, subds. (a), (c).) The public entity's governing body must act on the claim within specified time limits by rejecting, allowing, or settling it in whole or in part. (Gov. Code, §§ 900.2, 912.4, 912.6.) We conclude that a public entity's consideration of a claim filed pursuant to the Government Claims Act is an official proceeding authorized by law within the meaning of the anti-SLAPP statute. (See, e.g., *Laker v. Board of Trustees of California State University, supra*, 32 Cal.App.5th at pp. 764-765 ["internal investigations by schools into claims of discrimination qualify as 'official proceedings authorized by law' that receive the protections of the anti-SLAPP statute"]; *Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1439 [filing and investigation of citizen's complaint against peace officer is official proceeding authorized by law].)

The Brown Act is also relevant to our analysis. Its stated purpose is to ensure that public entities deliberate and act "openly." (Gov. Code, § 54950.) To effectuate this purpose it provides, "All meetings of a legislative body of a local agency shall be open

---

in connection with an issue under consideration by a legislative, executive, and judicial body. We need not address this alternative argument.

and public . . . except as otherwise provided by this chapter." (Gov. Code, § 54953, subd. (a).) A " 'meeting' " includes "any congregation of a majority of the members of a legislative body . . . to hear, discuss, deliberate, or take action on any item that is within the subject matter jurisdiction of the legislative body." (Gov. Code, § 54952.2, subd. (a).) A legislative body includes the governing board of a community college district. (Gov. Code, §§ 54951 [local agency includes school district], 54952 [" 'legislative body' " includes board of local agency].) The District's board is thus a legislative body within the meaning of the Brown Act, and because the board must meet in order to deliberate and act, its meetings have been classified as official proceedings authorized by law. (See *Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 324 [school board meetings "may be duly classified as official proceedings authorized by law"].)

We thus find that, when the board met to consider and act on Royer's claim submitted pursuant to the Government Claims Act, that meeting was an official proceeding authorized by law within the meaning of the anti-SLAPP statute (and we note Royer does not seriously suggest otherwise).

Moreover, and importantly, a claim that prompts an official proceeding is "itself . . . part of the official proceeding[]." (*Lee v. Fick* (2005) 135 Cal.App.4th 89, 97.) In the words of one court, "communications to an official agency, which are designed to induce the agency to initiate action, are as much a part of the 'official proceeding' as communications made after the agency commences proceedings." (*Brody v. Montalbano* (1978) 87 Cal.App.3d 725, 732, italics omitted.) Royer's government tort claim was thus part and parcel of the official proceeding at which it would be considered. Publishing the claim is equivalent to making a statement in an official proceeding and/or in connection with an issue under review in an official proceeding, and thus constitutes protected activity within the meaning of the anti-SLAPP statute. (See *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 730 [complaint to agency is statement

12

made in an official proceeding], disapproved on another ground in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, fn. 5.)

Royer argues she "is not suing [the District] for publishing her tort claim," but instead is suing "because [it] published her tort claim in full without redacting *her confidential information.*" The trial court appears to have agreed, because it found, "the gravamen of [Royer's] claim is not the publication of the Tort Claim itself, but the inclusion of her private medical and identifying information unnecessarily." Publishing Royer's claim and publishing it in full, however, is one and the same act, and that act constitutes protected activity.

As noted above, at the first step of the anti-SLAPP analysis, we consider the elements of the challenged claim, identify what acts by the defendant supply those elements and thus form the basis of liability, and then determine whether those acts constitute protected activity. (*Wilson v. Cable News Network, Inc., supra*, 7 Cal.5th at p. 884.) One of the elements of a cause of action for invasion of privacy is "conduct by defendant constituting a serious invasion of privacy." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 40.) Here, the conduct or act by the District that supplies that element is publishing Royer's claim. Whether the District should have redacted certain information before publishing it goes to the merits of the cause of action, not to whether the cause of action arises out of protected activity in the first place. At the first step of the anti-SLAPP analysis, "the question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected [citations], not whether it has shown its acts are ultimately lawful." (*Wilson, supra*, at p. 888.) Here, the act underlying the invasion of privacy claim (i.e., publishing Royer's tort claim) constitutes protected activity. The lawfulness or propriety of that act is properly addressed at the second step of the anti-SLAPP analysis, not at the first step. (*Ibid.*; see also *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017)

13

13 Cal.App.5th 757, 776 ["we do not consider the legitimacy of the plaintiff's claims" at the first step].)

Although it is distinguishable in many respects, *Dziubla v. Piazza* (2020) 59 Cal.App.5th 140 (*Dziubla*) illustrates this point nicely. The defendant in that case borrowed money from the plaintiff to expand its business. The plaintiff filed a notice of default, and the defendant filed a lawsuit in Nevada to prevent foreclosure. (*Id*. at pp. 145-146.) Around the time it filed the Nevada lawsuit, the defendant published an " 'Emergency Action Alert' " on its Web site. The alert described the plaintiff as a " 'Lying, Two-Faced, Gun-Grabbing Hillary Clinton Supporting Con Man.' " (*Id*. at p. 146.) It asked for monetary contributions to the defendant's " 'litigation war chest' " so that it could " '[d]estroy' " the plaintiff " 'by rapidly and aggressively prosecuting our lawsuit against him.' " (*Id*. at pp. 146, 150.)

The alert also contained the plaintiff's home address, a picture of his house, and a closeup photograph of his face. (*Dziubla, supra*, 59 Cal.App.5th at p. 146.) The court referred to this as "doxing" information, and it explained that doxing "is a relatively recent Internet-based form of harassment that involves posting a target's private personal information online so it can be used by other parties—perhaps the poster's supporters or internet 'trolls'—to attack the targeted individual."[5] (*Dziubla*, at p. 145, fn. 1.)

The plaintiff filed a lawsuit against the defendant in California, asserting claims for defamation and harassment based on the alert, and the defendant filed an anti-SLAPP motion. The trial court found that the alert and its publication constituted protected activity, and the plaintiff could not meet his burden of showing a probability of prevailing

---

[5]     There is no suggestion the District published Royer's claim on its Web site in order to dox her.

14

because the alert was protected by the litigation privilege.**6** The plaintiff appealed, and the appellate court affirmed in part and reversed in part.

The court "easily" concluded the challenged claims were based on the alert, and the alert "was written and distributed in connection with the Nevada litigation," and was thus a " 'writing made *in connection with* an issue under consideration or review by a . . . judicial body,' " which meets the definition of protected activity under the anti-SLAPP statute. (*Dziubla, supra*, 59 Cal.App.5th at p. 150.) The court thus found the defendant met its burden at the first step of establishing the claims arose out of protected activity, and it proceeded to the second step to consider whether the plaintiff established a probability of prevailing.

At the second step, the court agreed "the Alert generally falls under the litigation privilege," but it also found, "the fact that the Alert *generally* falls under the litigation privilege does not mean *everything* within it is automatically protected." (*Dziubla, supra*, 59 Cal.App.5th at pp. 155, 156, italics added.) In particular, the court found the doxing information "had no connection with, nor legitimate relation to, the Nevada litigation. As a result, it is not protected by the litigation privilege." (*Id*. at p. 157.)

The court concluded with the following summary that is relevant to this case: "In the preceding sections, we affirmed the principle that litigation-related communications such as the Alert fall under the protections of the anti-SLAPP statute *in the first step of the analysis. In the second step*, we clarified the contours of the litigation privilege and concluded that the doxing allegations fall outside of its protections because those disclosures were unrelated to the Nevada litigation." (*Dziubla, supra*, 59 Cal.App.5th at

---

**6** The litigation privilege " 'applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.' " (*Dziubla, supra*, 59 Cal.App.5th at p. 155.) "If the privilege applies, it cannot be set aside for any tort claim except malicious prosecution." (*Ibid*.)

p. 157, italics added.) It thus reversed the trial court's order as to those portions of the claims based on the doxing information and affirmed it in all other respects. (*Id.* at pp. 158-159.)

A similar analysis applies in this case. Publishing Royer's government tort claim was protected activity; her invasion of privacy cause of action is based on that protected activity; and the District thus met its burden at the first step. The trial court thus should have proceeded to the second step and determined whether Royer met her burden of establishing a probability of prevailing. At the second step, it would be appropriate to consider the arguments both parties make about the merits of the invasion of privacy claim. (See, e.g., *County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 926-932 [providing detailed example of how to analyze invasion of privacy claims].) This would include the District's arguments that publication of the claim was absolutely privileged pursuant to Civil Code section 47, and that Royer did not have an objectively reasonable expectation of privacy once she filed a government tort claim as a precursor to litigation. It would also include Royer's arguments that the District was not required by law to publish her claim in full, and that she had a reasonable expectation her address and medical diagnosis would be kept private. Because the trial court never reached the second step, we will remand this case with instructions to do so.

### 2. *Harassment Cause of Action*

Royer's harassment claim is based on Fernandez's posts to various social media platforms and campus communication portals, and on one statement he made about her. Royer claimed these posts and statements constitute harassment because of her race (Caucasian) and/or religious creed (Christian), in violation of FEHA. The trial court found the posts and statements constitute free speech activities that were protected under the anti-SLAPP statute, and the District thus met its burden of establishing the harassment claim arises from protected activity. The trial court also found Royer met her

16

burden of establishing a probability of prevailing on the harassment claim. Royer challenges the trial court's finding that her harassment claim arises from protected activity,[7] and the District challenges the trial court's finding that Royer met her burden of establishing a probability of prevailing on her claim.

A.    *Protected activity*

As she did in the trial court, Royer argues Fernandez's posts are not protected activity because they constitute criminal threats. She cites the rule that the anti-SLAPP statute "cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 317.) In order to defeat an anti-SLAPP motion at the first step, however, "it is not sufficient that plaintiffs can reasonably *argue* or offer *some evidence* that defendant's conduct was unlawful. Rather, at this early stage of the proceedings, the illegality exception applies only if the defendant's activity is 'illegal as a matter of law,' meaning either the defendant concedes the point or the evidence 'conclusively establishes' as much." (*Dziubla, supra*, 59 Cal.App.5th at p. 151.) Here, the District does not concede that any of Fernandez's posts or statements are illegal as a matter of law, and Royer fails to convince us that the evidence conclusively establishes such.

The only post that Royer cites to support her argument is Fernandez's "Kill your boss" post. Here, in its entirety, is the post:

> "Today, my students came over to paint banners, then we had
> a great community self-defense class.

---

[7]    We consider Royer's argument even though she did not file a notice of appeal because our review is de novo, and if we agreed with her argument, it would provide an alternative basis for upholding the trial court's order denying the motion to strike the harassment claim.

"Fernandez fact: Filling your days with the things you love—family, friends, skateboarding, running, fitness, writing deadlines, and getting punched in the face—can cure your addictions. It can create joy in the darkest part of your brain. It can forge a path for a healthy life, even if right now your life is in shambles.

"Also: Kill your boss.

"Thank you for coming to my TED talk."

Royer stated that because she was Fernandez's supervisor and thus his " 'boss' " at the time, she viewed the post as "a viable threat to cause me bodily harm. I believed that my physical wellbeing and even my life could be in danger."

A criminal threat is defined as follows: "[W]illfully threaten[ing] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (Pen. Code, § 422, subd. (a).) Criminal threats is a "specific intent" crime, and requires proof the defendant made the threat " 'with the specific intent that [it] is to be taken as a threat.' " (*People v. Toledo* (2001) 26 Cal.4th 221, 228.)

The trial court found the "Kill your boss" post did not meet this definition because it did not willfully threaten to commit a crime; did not reflect specific intent to be taken as a threat; was not unequivocal, unconditional, immediate, and specific; did not reasonably convey an immediate prospect of execution; and would not cause a reasonable person to fear for their safety. We agree. To this we would add there is no evidence

18

Fernandez specifically intended the post as a threat to anyone, because according to an attachment to Royer's declaration, Dean Snowden spoke to Fernandez about the "Kill your boss" comment, and Fernandez said it was not directed at him and was a commonly used "punk" phrase similar to "stick it to the man." We also note the post has nothing to do with race or religion, and thus, even if we were to assume the post was illegal, Royer's harassment claim does not arise from it.

Like the trial court, we find the evidence does not conclusively establish Fernandez's post constituted a criminal threat as a matter of law.[8]

B.      *Probability of prevailing*

FEHA makes it an unlawful employment practice for an employer to harass an employee because of race or religion. (Gov. Code, § 12940, subd. (j)(1).) Numerous courts have emphasized that FEHA "is 'not a "civility code," ' " and it was not intended to protect employees against all offensive, boorish, rude, obnoxious, or vulgar conduct in the workplace. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 295 (*Lyle*); see also *Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1061.) Instead, in order to be actionable, the conduct must be both (1) "because of" the plaintiff's race or religion, and (2) "sufficiently severe or pervasive to alter the conditions of . . . employment and create a hostile work environment." (*Holmes, supra*, at p. 1059.)

" ' "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' " (*Lyle, supra*, 38 Cal.4th at p. 283.) "[A]n employee generally cannot

---

[8]     The trial court found all of the posts constituted protected speech under the anti-SLAAP statute and the District does not contest otherwise so we do not address it.

19

recover for harassment that is occasional, isolated, sporadic, or trivial." (*Ibid.*) The conduct " 'must be both objectively and subjectively offensive . . . .' [Citations.] That means a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, considering all the circumstances, would not share the same perception." (*Id.* at p. 284.)

"Generally, . . . conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff. [Citations.] A hostile work environment . . . harassment claim by a plaintiff who was not personally subjected to offensive remarks" thus requires a showing " 'that the . . . harassing conduct permeated [her] direct work environment.' " (*Lyle, supra*, 38 Cal.4th at pp. 284-285.) "To meet this burden, the plaintiff generally must show that the harassment directed at others was in her immediate work environment, and that she personally witnessed it." (*Id*. at p. 285.) Moreover, because FEHA prohibits "*workplace* harassment," where the alleged harassment occurs outside the workplace or after working hours, the plaintiff must show " 'a legally sufficient nexus between the employment relationship and the act of harassment,' " or that the complained of conduct was "work-related" in some way. (*Atalla v. Rite Aid Corp.* (2023) 89 Cal.App.5th 294, 309, 316, 313.)

The District argues Royer cannot establish two elements of her harassment claim: (1) that the conduct she complained of was because of her race or religion; or (2) that it was sufficiently severe or pervasive as a matter of law. We agree.

With one exception (discussed below), Royer's harassment claim was based entirely on Fernandez's posts. None of the posts expressly reference Royer; most of the posts have nothing to do with race and religion; and the posts that do mention race or religion are not sufficiently severe or pervasive as a matter of law.

Only two of the posts are even arguably about race. One post states, "Grades are in. Time to eat tortillas and beat up racists." The other states, "I've been organizing with

20

anti-racist groups since I was 16 years old and know that fighting racism requires . . . organization, solidarity, strength, bravery, the ability to be wildly uncomfortable and on the rare occasion, a foot up someone's ass." To the extent Royer contends these posts constitute racial harassment, we disagree. FEHA prohibits harassment because of race, not harassment because of racism, and Royer does not contend that condemning racism is equivalent to condemning someone's race. These posts are also not objectively offensive enough to create a work environment that is hostile to Caucasians.

In her brief, Royer states Fernandez encouraged others "to view [her] negatively on account of her race and conservative views as a means of making his points about racism and political ideology," and she supports this statement by citing her declaration that she has "personal knowledge that Mr. Fernandez made statements to my colleagues to view me negatively on account of my race, beliefs and conservative views."[9] Making negative statements about her conservative views, however, is not harassment because of race (or religion for that matter), and we note FEHA does not prohibit harassment because of political views or ideology. (Gov. Code, § 12940, subd. (j)(1) [listing protected classes].) Moreover, Royer's bare statement that Fernandez encouraged others to view her negatively on account of her race, with no additional details about what he actually said, is insufficient to sustain her burden of establishing a probability of prevailing. (See *Baral, supra*, 1 Cal.5th at p. 384 ["second step" of anti-SLAPP analysis is a " 'summary-judgment-like procedure' "]; *Trovato v. Beckman Coulter, Inc.* (2011) 192 Cal.App.4th 319, 325 ["conclusory statements in [the plaintiff's] declaration" that her manager was harassing her were "not sufficient to raise a triable issue of material fact" and thus avoid summary judgment]; *Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197 [a plaintiff cannot avoid summary judgment "by 'cryptic,

---

[9] Royer's brief and declaration are full of references to Fernandez's "extreme political views," and his hostility to her "conservative views."

21

broadly phrased, and conclusory assertions' "]; see also *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 613-614 ["conclusionary" allegation supervisor made "offensive statements of a sexual nature" was insufficient where the plaintiff did not allege "[w]hat lewd remarks" supervisor made or "exactly what . . . the offensive statements of a sexual nature" were].)  This is particularly true because the actual posts about which Royer complains contain no comments that are even remotely negative towards Caucasians.  Although we acknowledge that racial harassment can include racial slurs and epithets and other derogatory comments on account of race (Cal. Code Regs., tit. 2, § 11019, subd. (b)(2)(A)), Royer does not contend Fernandez ever made such comments to her, about her, or in her presence.

The following posts are about religion (either directly or indirectly):

(1)  A Facebook photo of children's blocks spelling out the word "Satan."

(2)  A Facebook post of a photo of Fernandez with the caption "Satan bless you."

(3)  A Facebook post of a photo of a smiling Fernandez holding a baby and standing next to a smiling woman.  The posts states:  "Have a satanic black metal Christmas.  Burn churches.  Murder the rich.  Punch cops.  Wear legit fashion.  Love the Fernandez clan."

(4)  A Facebook post of a photo from what looks like a music concert.  The post states:  "I don't mind torturing religious extremists.  In fact, I think we should start at Bayside Church."

(5)  A Facebook post of a blurry photo of a person dressed in black walking down a street, captioned, "Armed protestors stalk peaceful Muslims at Texas mosque: We want to show force."

These posts are insufficient to establish a probability of prevailing on a religious harassment claim.  While use of the word "Satan" may be offensive to some, we find that, without more, Fernandez's use of it is insufficient to alter the terms and conditions of Royer's employment and create a hostile work environment because of her religion, particularly where, as here, Fernandez did not send or direct these posts to Royer and

they were posted to his personal Facebook page. We also cannot imagine how a report about protestors stalking Muslims could be viewed as offensive to Christians in general or to Royer in particular.

We agree that two of the posts do express hostility to religion and could be found objectively offensive: "Burn churches," and "I don't mind torturing religious extremists. In fact, I think we should start at Bayside Church." However, the posts do not appear to be about Royer; Fernandez did not send them to her or make similar comments to her or in her presence; they appear to have been published on Fernandez's personal Facebook page and were thus made outside the workplace; and Royer was apparently not even aware of the posts when they were published and only became aware of them years later when others brought them to her attention. Because the posts were not directed at or sent to her and she only became aware of them through others, Royer must establish they " 'permeated [her] direct work environment,' " (*Lyle, supra*, 38 Cal.4th at p. 285), and because they were made outside the workplace, she must show " 'a legally sufficient nexus between the employment relationship and the [posts],' " or that they were "work-related" in some way (*Atalla v. Rite Aid Corp., supra*, 89 Cal.App.5th at pp. 316, 313). She fails to make such a showing. Although the facts are different, we find *Brennan v. Townsend & O'Leary Enterprises, Inc.* (2011) 199 Cal.App.4th 1336 is instructive. In that case, the plaintiff had experienced or witnessed a few instances of workplace conduct that she found offensive or demeaning to women. (*Id*. at pp. 1341-1342.) She "started speaking to past and present employees . . . to find out whether there were other examples of sexual harassment at the [workplace]," and she learned of several other incidents of harassment as a result. (*Id*. at p. 1342.) On appeal from the trial court's granting of the defendants' motion for judgment notwithstanding the verdict, the appellate court held these other instances of harassment were not probative to the plaintiff's sexual harassment claim, explaining: "[T]he evidence shows plaintiff did not have any knowledge or perception of those other acts of sexual harassment, some of which had

23

occurred over a year before she discovered them . . . , until she conducted her own investigation 'to see if there were other examples' of sexual harassment at the [workplace]. Notwithstanding plaintiff's discovery of certain incidents shortly before her employment . . . ended, how, under those circumstances, can those incidents be probative in showing that sexual harassment . . . ' "permeated" ' *plaintiff's* immediate workplace environment and was ' " 'pervasive and destructive' " ' within the meaning of sexual harassment jurisprudence?" (*Id*. at p. 1359.) So, too, in this case. How can Fernandez's personal Facebook posts, that he did not send to Royer, that were not about her, that she did not see at the time, and that she only discovered years later when others showed them to her, be sufficiently severe or pervasive to create a hostile work environment within the meaning of FEHA harassment jurisprudence? We find that a reasonable person would not perceive a work environment to be objectively hostile or abusive based on posts from a coworker's personal Facebook page, that were not sent to her or about her, that she was unaware of at the time, and that she only became aware of years later when others brought them to her attention.

Finally, we note that both posts were published in December 2014, which is four years before anyone showed them to Royer.[10] None of Fernandez's more recent posts contain similarly offensive statements about religion (or even statements about religion at all). We find these two posts are thus too "occasional, isolated, [and] sporadic" to support a harassment claim. (*Lyle, supra*, 38 Cal.4th at p. 283.)

Fernandez's remaining posts have nothing to do with race or religion. We have already quoted one of the posts in full (the "Kill your boss" post); it makes no mention of race or religion, and there is no suggestion it was motivated by racial or religious animus.

---

**10** Royer stated Dean Snowden showed her some of Fernandez's posts in November or December 2018, and she became aware of other posts in March 2019, when other colleagues showed them to her.

24

Other posts include advertisements for a "bash-back" self-defense class, and advice for people planning to attend a Donald Trump protest. Royer fails to explain how these posts created an objectively hostile or abusive work environment because of her race or religion.

Many of the posts contain rhetoric some might view as violent. ("When I was little . . . I punched the vice principal got kicked out of school." "The only good fascist is a dead fascist." "Fuck the FBI, fuck the police, fuck the sacred institutions of education." "When they go low, we go high enough to punch them in the face." "Let's get violent.") We agree that threats of violence *can* constitute harassment. (See *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043.) In order to be actionable under FEHA, however, Royer must demonstrate the threats were directed or aimed at her *because of* her race or religion. (See Cal. Code Regs., tit. 2, § 11019, subd. (b)(2)(B) [harassment includes "[p]hysical harassment, e.g., assault, impeding or blocking movement, or any physical interference with normal work or movement, when directed at an individual on a basis enumerated in [FEHA]"]). None of these posts are directed at Royer (or anyone else, for that matter), and none has anything to do with race or religion. Moreover, we would be hard pressed to characterize any of these posts as true threats. Thus, the fact that some of Fernandez's posts contain violent rhetoric does not, at least without more, demonstrate a probability of prevailing on the harassment claim.

Other than Fernandez's posts, Royer identified only one allegedly harassing statement that he made about her: He told a colleague he "hated" her because she gave him a "less than satisfactory" evaluation. On its face, the only plausible inference is that this statement was motivated by Fernandez's displeasure at the unsatisfactory evaluation Royer gave him. There is no suggestion that Fernandez hated Royer because of her race or religion, or that this statement was somehow racially or religiously motivated.

25

For the reasons stated above, we find Royer failed to establish a probability of prevailing on her harassment claim, and the District's motion to strike that claim thus should have been granted.

### 3. Remaining Claims and Allegations

### A. Retaliation

FEHA prohibits retaliating against an employee for "oppos[ing] any practices forbidden" by FEHA. (Gov. Code, § 12940, subd. (h).) To establish a prima facie case of retaliation, Royer must show (1) she engaged in protected activity by opposing practices prohibited by FEHA,[11] (2) the District subjected her to an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 815.) Protected activity includes complaining about "conduct that the employee reasonably believes to be [prohibited by FEHA], even when a court later determines the conduct was not actually prohibited by the FEHA." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1043.)

In support of her retaliation claim, Royer alleged she complained about Fernandez's race and religious creed harassment, and the District thereafter retaliated against her by removing her as department chair and matriculation committee chair, and by publishing her government tort claim online.

Citing *Baral, supra*, 1 Cal.5th 376, the District moved to strike the portion of the retaliation claim that is based on protected activity (i.e., publishing her government tort claim online).[12] In *Baral*, our Supreme Court held that, with "a so-called 'mixed cause of

---

**11**  Not to be confused with "protected activity" under the anti-SLAPP statute.

**12**  Despite the District's contention at oral argument, the record does not support that it also moved to strike the portion of the retaliation claim based on Royer's removal from chair positions.

26

action' that combines allegations of [protected] activity . . . with allegations of unprotected activity," an anti-SLAPP motion can be used to strike that portion of the cause of action "founded on allegations of protected activity," but it cannot be used to strike that portion of the cause of action "based on unprotected activity." (*Baral*, at pp. 381, 382.) What this means in this case is that the District could (and did) move to strike that portion of the retaliation cause of action that is based on the allegation that it retaliated against Royer by publishing her government tort claim, because that portion of the cause of action is based on protected activity. It also means the District could not (and did not) move to strike that portion of the cause of action that is based on the allegation that it retaliated against her by removing her as department chair and matriculation committee chair, because that portion of the cause of action is *not* based on protected activity.

The trial court found Royer "has adequately demonstrated a probability of prevailing on her retaliation claim for purposes of the anti-SLAPP analysis." The District challenges this finding, arguing Royer cannot establish it had anything to do with removing her from the department chair and matriculation committee chair positions (it claims those decisions were made by, respectively, the English department and the faculty senate), and there is thus no causal link between her complaints and the removal. That portion of the retaliation claim, however, *was not subject to the anti-SLAPP motion*, and the merit of that portion of the retaliation claim was thus not before the trial court and is not before us. In other words, the District cannot move to strike that portion of a cause of action that arises from protected activity, and thereby force Royer to establish a probability of prevailing on that portion of the cause of action that does not arise from protected activity.

As for the District's argument that Royer fails to allege facts showing she engaged in protected activity within the meaning of FEHA, we disagree. She alleges she complained about racial and religious creed harassment, and her complaints constitute

27

protected activity so long as she had a good faith belief the conduct she complained of was prohibited by FEHA. (*Yanowitz v. L'Oreal USA, Inc., supra*, 36 Cal.4th at p. 1043.) At this early stage of the proceeding, that is sufficient to establish she engaged in protected activity.

    *B.    Failure to prevent discrimination, harassment, and retaliation*

    FEHA makes it an unlawful employment practice "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" (Gov. Code, § 12940, subd. (k)), and Royer's failure to prevent cause of action is based on the allegation that the District failed to take all such reasonable steps. The District cites *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289, for the following proposition: " '[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen . . . .' Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented." The District then argues the failure to prevent cause of action stands or falls with the viability of the discrimination, harassment, and retaliation causes of action, and because those three causes of action were or should have been stricken, the failure to prevent cause of action must be stricken as well. The trial court appears to have agreed with the District's framing of the issue because it found Royer "has established a minimum level of probability of prevailing as to her harassment and retaliation claims," and her failure to prevent claim thus "survives." Royer appears to agree as well, because she argues if any portion of any one of her causes of action for harassment, discrimination, or retaliation survives the motion to strike, the failure to prevent cause of action does as well.

    We will frame the issue the same way the District, the trial court, and Royer framed it. And because we find portions of the retaliation cause of action survive the

28

motion to strike (and, indeed, were not subject to the motion to strike), that means the failure to prevent cause of action survives as well.

C.   *Miscellaneous allegations*

In addition to moving to strike all or portions of five causes of action, the District also moved to strike all allegations in the complaint about statements made during Fernandez's tenure review process. It cited *Baral, supra*, 1 Cal.5th 376 for the proposition that, like a "regular" motion to strike, an anti-SLAPP motion can be used "as a way of challenging particular allegations within a pleading." (*Id.* at p. 394.) To give one example, the District moved to strike the following portion of paragraph No. 14 of the complaint, which is in the section titled "Facts Common to all Causes of Action": "Royer and other members of the tenure committee (BJ Snowden and Francis Fletcher . . . ) expressed serious concerns regarding Mr. Fernandez's conduct on campus and use of [District] platforms during the tenure process. At one point, BJ Snowden told Royer that the college could not grant tenure to Fernandez because he was too dangerous, and tenure would likely embolden him to act more aggressively on campus." The trial court found statements made during the tenure review process constitute protected activity, but it did not then go through and rule on each discrete allegation the District moved to strike.

The District argues the tenure review process is an official proceeding authorized by law; statements made during that process are, by definition, made in an official proceeding, and thus constitute protected activity as defined by the anti-SLAPP statute; and the trial court thus should have stricken all allegations about statements made during the tenure review process. We disagree because none of Royer's causes of action is based on statements made during the tenure review process, and those statements do not " 'supply [the] elements' " of any of her causes of action. (*Wilson v. Cable News Network, Inc., supra*, 7 Cal.5th at p. 884.) Instead, those allegations merely provide background information and context to her causes of action, and thus "cannot be stricken

29

under the anti-SLAPP statute." (*Baral, supra*, 1 Cal.5th at p. 394; see also *Bonni v. St. Joseph Health System, supra*, 11 Cal.5th at p. 1012 [allegations that provide "incidental background" to claims but that do not "supply the elements of a claim" are not subject to an anti-SLAPP motion).

## DISPOSITION

The order denying the anti-SLAPP motion is reversed as to Royer's first cause of action for harassment because she did not establish a probability of prevailing on that cause of action. The order denying the anti-SLAPP motion as to Royer's seventh cause of action for invasion of privacy is also reversed because the trial court erred in finding it did not arise out of protected activity, and we remand this case to the trial court to determine whether Royer established a probability of prevailing on the invasion of privacy cause of action. In all other respects, the order is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.248(a)(5).)

/s/
EARL, P. J.

We concur:

/s/
RENNER, J.

/s/
ASHWORTH, J.*

\* Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30